**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **RUKMINI CALLIMACHI**, |
| Plaintiff, |
| v. |
| **FEDERAL BUREAU OF INVESTIGATION**, *et al.*, |
| Defendants. |

Case No. 20-cv-1362 (TNM)

## MEMORANDUM OPINION

This case concerns government records about the death of Mihail Botez, a former Romanian ambassador to the United States.  Botez's stepdaughter, Rukmini Callimachi, filed a Freedom of Information Act request with the Federal Bureau of Investigation for records about him.  Disappointed with the FBI's response, Callimachi filed five more requests for records on other Romanian politicians and institutions.  The FBI refused to even confirm or deny the existence of records responsive to those requests.

Callimachi then sued under FOIA.  Although the FBI released more information relating to her original request, it still refused to confirm or deny the existence of other records.  The parties have cross-moved for summary judgment.  Because the Bureau has properly justified its responses, the Court will grant its motion and deny Callimachi's.

## I.

Botez died in July 1995 in Bucharest.[1]  He had been a "leading dissident" against Nicolae Ceaucescu, the longtime Communist ruler of Romania.  Compl., Ex. A at 2, ECF No. 1-1.[2]  After Ceaucescu's fall in 1989, Romania's new democratic government named Botez the ambassador to the United States.  *See id.*  He held that position until his death.

Callimachi is an "international investigative reporter for the *New York Times*."  Compl. ¶ 2.  In 2019, she submitted a FOIA request (the Botez Request) to the FBI and the State Department for all records "mentioning or referring to" Botez.  Compl., Ex. A at 2.  The FBI released 51 pages of responsive records to Callimachi, but she administratively appealed, arguing that the Bureau had conducted an inadequate search and that all records should be fully disclosed.  *See* Compl. ¶¶ 9–10.  Callimachi's request for records on Botez comprises Count I of her Complaint.  *See id.* ¶¶ 50–53.

One month after Callimachi appealed the FBI's first response, she filed five more FOIA requests.  Those requests comprise the other counts in her Complaint.  She requested records about Virgil Magureanu, the former head of the Romanian domestic intelligence service, *see id.* ¶¶ 14, 54–57 (Count II); Iulian Buga, the Romanian ambassador to the United States in the mid-2010s, *see id.* ¶¶ 21, 58–61 (Count III); and Ioan Talpes, the former head of the Romanian foreign intelligence service, *see id.* ¶¶ 28, 62–65 (Count IV).  In her two final requests,

---

[1]  *See Mihai Botez, Romanian Ambassador to Washington*, Associated Press (July 11, 1995), https://apnews.com/article/062b2e351052b131a1fa09777eda9b88.  In this article, a spokeswoman for the Romanian embassy confirmed Botez's death in Bucharest.  The Court may take judicial notice of news articles that publicize certain facts "already validated by an official source."  *Washington Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991).

[2]  All page citations refer to the pagination generated by the Court's CM/ECF system and all exhibit numbers refer to the numbered attachments to the CM/ECF filings.

Callimachi sought records on UM 0215 (Count V) and UM 0544 (Count VI), Romanian intelligence agencies from the country's Communist period.  *See id.* ¶¶ 35, 43, 66–69, 70–73.

For those five requests, the FBI responded with what are known as "*Glomar* responses": refusals to confirm or deny the existence of the requested records.  *See* Seidel Decl. ¶ 4 n.1, ECF No. 19-2.  The FBI asserted that FOIA Exemptions 6 and 7(C) justified a *Glomar* response to the three requests for records on Magureanu, Buga, and Talpes.  *See* Compl. ¶¶ 16, 23, 30.  And for the requests about records on the intelligence services, the FBI cited Exemptions 1 and 3 for the *Glomar* response.  *See* Compl. ¶ 37; Seidel Decl. ¶ 129.

After Callimachi filed her Complaint, the FBI identified 171 pages of records responsive to her Botez Request.  *See* Seidel Decl., Ex. V (*Vaughn* Index) at 299, ECF No. 19-2.  The FBI released 90 pages and completely withheld 81 pages.  On many of the released pages, the FBI redacted information under various FOIA exemptions.  *See id.*[3]  The FBI then filed for summary judgment, arguing that it had properly redacted information in the Botez records and that it had correctly asserted *Glomar* responses.  *See* Defs.' Mot., ECF No. 19-1.  Callimachi filed her own cross-motion, arguing that the FBI had not properly asserted *Glomar* responses and challenging various aspects of the agency's actions on her Botez request.  *See* Pl.'s Mot., ECF No. 21-1.  Both motions are now ripe.[4]

## II.

To prevail on a motion for summary judgment, a party must show that "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  FOIA generally requires

---

[3]  The State Department also redacted information, but Callimachi does not challenge those redactions.  *See* Pl.'s Mot. at 14, n. 4.

[4]  The Court has jurisdiction under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

"disclosure of documents held by a federal agency unless the documents fall within one of nine enumerated exemptions, which are listed at 5 U.S.C. § 552(b)." *U.S. Fish and Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021).  An agency claiming an exemption bears the burden to show its applicability to the withheld information.  *See ACLU v. DOD*, 628 F.3d 612, 619 (D.C. Cir. 2011).  Courts review those determinations de novo.  *See King v. Dep't of Justice*, 830 F.2d 210, 217 (D.C. Cir. 1987).

Sometimes, "the fact of the existence or nonexistence of agency records" itself falls within a FOIA exemption.  *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2011).  When presented with that scenario, the agency may "refuse to confirm or deny the existence of records," *id.*, when admitting their existence "would itself cause harm cognizable" under FOIA, *Roth v. DOJ*, 642 F.3d 1161, 1178 (D.C. Cir. 2011) (cleaned up).  This is known as a "*Glomar* response" after the CIA refused to divulge whether it had records about a ship called the *Glomar Explorer*.  *See Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976).  Agencies commonly make *Glomar* responses when "admission or denial could itself compromise national security."  *Mil. Audit Project v. Casey*, 656 F.2d 724, 730 (D.C. Cir. 1980).

When reviewing a *Glomar* response, courts "apply the general exemption review standards established in non-*Glomar* cases."  *Knight First Amdt. Inst. at Columbia Univ. v. CIA*, 11 F.4th 810, 813 (D.C. Cir. 2021).  The agency thus bears the burden to justify a *Glomar* response.  5 U.S.C. § 552(a)(4)(B).

To meet both its *Glomar* burden and its burden on exemptions, an agency may rely on affidavits.  *See Shapiro v. Dep't of Justice*, 893 F.3d 796, 799 (D.C. Cir. 2018).  Those affidavits receive "a presumption of good faith."  *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991).  The Court may grant summary judgment based on the agency's affidavits alone if

they are not contradicted by record evidence or by evidence of the agency's bad faith.  *See*

*Aguiar v. DEA*, 865 F.3d 730, 734–35 (D.C. Cir. 2017)*.*  Most FOIA cases are decided at this

stage.  *AARC v. CIA*, 317 F. Supp. 3d 394, 399 (D.D.C. 2018), *aff'd*, 781 F. Appx. 11 (D.C. Cir.

2019) (per curiam) (unpublished).

### III.

The Court first analyzes the FBI's *Glomar* responses.  Callimachi challenges the FBI's

*Glomar* response for records related only to Magureanu (Count II), Talpes (Count IV), and UM

0215 (Count V).

### A.

She first argues that those responses are "implausible" because of "the historical context

and events surrounding Magureanu, Talpes, and UM 0215" and their "key roles . . . in the events

leading up to and immediately following the Romanian Revolution of 1989."  Pl.'s Reply at 5,

ECF No. 25.  In fact (she contends) "it would be a scandal" if the FBI lacked any responsive

records on those subjects.  Pl.'s Mot. at 10.

Callimachi also asserts that other releases show the existence of FBI records.  Talpes told

a Romanian newspaper in 2011 that as head of the Romanian intelligence service he met the FBI

director.  *See* Declaration of Rukmini Callimachi ¶ 9, Pl.'s Mot., Ex. G, ECF No. 21-8.  The two

discussed Romanian spies remaining in the United States.  *See id.* ¶¶ 9–17.  Callimachi

extrapolates from this story that the FBI must have records on Talpes.  *See* Pl.'s Mot. at 10.  As

for Magureanu and UM 0215, she cites a document released through an Illinois state FOIA

request.  *See* Pl.'s Mot., Ex. F, ECF No. 21-7.  That document is on what appears to be FBI

letterhead and mentions Magureanu and UM 0215.  *See id.* at 3.  Based on this discussion of

Magureanu and UM 0215 "in [the FBI's] own records already in full public view," Callimachi says the FBI's *Glomar* response "strains credulity."  Pl.'s Mot. at 10.

At first blush, Callimachi's arguments appear to assert that the FBI has "already disclosed the fact of the existence (or nonexistence) of responsive records."  *ACLU v. CIA*, 710 F.3d 422, 427 (D.C. Cir. 2013).  If those documents establish the existence of records, then the FBI's *Glomar* responses would fail.  *See id.*  "Indeed, when information has been officially acknowledged, its disclosure may be compelled" over a *Glomar* response.  *Wolf*, 473 F.3d at 378 (cleaned up).

But Callimachi disclaims any "official acknowledgment" argument.[5]  *See* Pl.'s Reply at 4 ("Plaintiff does not argue that information released by the Chicago Police Department revealing FBI records discussing Magureanu and UM 0215 or statements made by Talpes about his meetings with FBI officials constitute official acknowledgement.").  Callimachi's argument thus boils down to the following proposition:  The FBI must have records on these subjects because it

---

[5]  And wisely so.  Under that theory, she would bear the burden to show that the Bureau had officially acknowledged the information.  *See Knight First Amdt. Inst.*, 11 F.4th at 815.  That argument would suffer from three flaws here.  First, Callimachi provides little assurance that the document released in the Illinois FOIA request is not a fabrication.  That it appears on FBI letterhead helps but does not confirm its legitimacy.  Second, that document mentions Magureanu and UM 0215 during a description of a "Jane's Intelligence Review article."  *See* Pl.'s Mot., Ex. F at 3.  So assuming the document is genuine, it reveals at most the existence of articles in *Jane's* about Magureanu and UM 0215.  It says nothing about whether the *FBI* has similar records.  Similarly, Talpes's stories about his interactions with the FBI do not confirm the existence of FBI records about him.  But even if they did, Callimachi runs into a third, final hurdle.  Only "the agency from which the information is being sought" can make an official acknowledgement.  *Knight First Amdt. Inst.*, 11 F.4th at 816.  Talpes's statements to Romanian media thus cannot acknowledge anything on the FBI's behalf, nor can a disclosure made by the Chicago police department.  These prior disclosures from other entities do not "waive" the FBI's ability to assert a *Glomar* response.  *ACLJ v. NSA*, 474 F. Supp. 3d 109, 121 (D.D.C. 2020).

has a "clear" interest, Pl.'s Mot. at 10, in "historical events and foreign intelligence operatives," Pl.'s Reply at 5.

Callimachi cites no precedent supporting this argument. True, she relies on *ACLU v. CIA*, 710 F.3d 422, 431 (D.C. Cir. 2013), for the proposition that an agency's *Glomar* response must be "plausible." *See* Pl.'s Reply at 5. But *ACLU* is about official acknowledgement, the exact argument Callimachi rejects.

*ACLU* considered whether the CIA could assert a *Glomar* response for records about drone strikes against targeted individuals. 710 F.3d at 425–26. The CIA had said that revelation of the existence of those records would reveal the CIA's intelligence interest in drone strikes. *See id.* at 430. That was the "only reason" given by the agency. *Id.* On appeal, the ACLU argued only that the CIA had already officially acknowledged that interest in the public domain. *See id.* at 428. The Circuit found that multiple prior statements from agency officials had officially acknowledged the CIA's intelligence interest in drone strikes. *See id.* "*Given those statements*, it [was] implausible that the CIA [did] not possess a single document on the subject of drone strikes." *Id.* at 431 (emphasis added).

The CIA's earlier statements mattered in *ACLU*. The Circuit overturned the agency's *Glomar* response not because the CIA must as a matter of its mission have responsive records, but because the agency had already officially acknowledged its interest. Callimachi's concession that there has been no official acknowledgement here thus vitiates her reliance on *ACLU*.

Callimachi fares no better by focusing on the allegedly "clear" FBI interest in the requested subjects. For Magureanu and Talpes, "either confirming or denying an [FBI] interest in a foreign national" would reveal FBI priorities, "thereby providing foreign intelligence

sources with a starting point for applying countermeasures against the [FBI] and thus wasting [Bureau] resources." *Wolf*, 473 F.3d at 376–77.

The same goes for UM 0215. The "mere fact" that the FBI monitored "specific governments at specific times would be useful information for foreign adversaries." *Knight First Amdt. Inst.*, 11 F.4th at 820. The FBI "has the right to assume that foreign intelligence agencies are zealous ferrets" that will key on any "individual piece of intelligence information." *Gardels v. CIA*, 689 F.2d 1100, 1106 (D.C. Cir. 1982). Thus, even if the FBI's mission encompasses investigations into historical events and foreign operatives (as Callimachi contends), that mission does not foreclose assertion of a *Glomar* response. *See EPIC v. NSA*, 678 F.3d 926, 932 (D.C. Cir. 2012) (upholding a *Glomar* response because confirming the existence of records would hinder a part of the NSA's public mission).

## B.

That the FBI can make a *Glomar* response does not mean that it sufficiently defended its responses here. The Bureau still "bears the burden to sustain a *Glomar* response." *Knight First Amdt. Inst.*, 11 F.4th at 813. Recall that the Court may grant summary judgment based on agency affidavits. *See EPIC*, 678 F.3d at 931. Affidavits supporting a *Glomar* response must survive "general exemption review standards established in non-*Glomar* cases." *Wolf*, 473 F.3d at 374–75. And the Court owes deference to the executive for FOIA claims "which implicate national security." *Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 927 (D.C. Cir. 2003); *see Wolf*, 473 F.3d at 374 ("[C]ourts must accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record." (cleaned up)).

**1.**

On the requests for records about Magureanu and Talpes, the FBI justified its *Glomar*

responses on FOIA Exemptions 6 and 7(C).  *See* Seidel Decl. ¶ 143.  Exemption 6 protects

"personnel and medical files and similar files the disclosure of which would constitute a clearly

unwarranted invasion of privacy."  5 U.S.C. § 552(b)(6).  Exemption 7(C) protects records

"compiled for law enforcement purposes" if the production of those records "could reasonably

be expected to constitute an unwarranted invasion of personal privacy."  *Id.* § 552(b)(7)(C).

Callimachi agrees that the FBI is a law enforcement agency, *see* Pl.'s Mot. at 18, and thus any

responsive records would be "compiled for law enforcement purposes" under Exemption 7(C).

Because Exemption 7(C)'s language is broader than the comparable language in Exemption 6,

the Court confines its analysis to Exemption 7(C).  *See PETA v. NIH, et al.*, 745 F.3d 535, 541

(D.C. Cir. 2014).  That exemption requires the Court "to balance the privacy interest[s]" of

Magureanu and Talpes "against the public interest in disclosure."  *CREW v. DOJ*, 746 F.3d 1082,

1091 (D.C. Cir. 2014).

The privacy interest is straightforward.  "Individuals have an obvious privacy interest

cognizable under Exemption 7(C) in keeping secret [ ] that they were subjects of a law

enforcement investigation."  *Id.* (cleaned up).  As the D.C. Circuit has explained, "[i]f a FOIA

request is made for FBI investigative records regarding a particular individual, the FBI's mere

acknowledgment that it possesses responsive records associates the individual" with "suspected

criminal activity."  *Id.*; *see also Roth*, 642 F.3d at 1174 ("As we have long recognized, the

mention of an individual's name in a law enforcement file will engender comment and

speculation and carries a stigmatizing connection." (cleaned up)).  Since any responsive

documents would mention Magureanu and Talpes, they have a "significant privacy interest[ ]" at stake.  *Roth*, 642 F.3d at 1174.

To overcome those privacy interests, Callimachi "bears the burden" to show a public interest from disclosure.  *Id.* at 1175.  She makes no such showing.  In fact, Callimachi mentions no public interest in her filings.  The Court will not make an argument for her.

The Court thus upholds the FBI's *Glomar* responses in Counts II and III of the Complaint.  Magureanu and Talpes have a substantial privacy interest, and disclosure on the existence of the responsive records about them would compromise that interest.  Callimachi asserts no countervailing public interest in disclosure.  The Court therefore "need not linger over the balance."  *NARFE v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989).  "[S]omething, even a modest privacy interest, outweighs nothing every time."  *Id.*; *see Jud. Watch, Inc. v. DOJ*, 898 F. Supp. 2d 93, 106 (D.D.C. 2012) (upholding *Glomar* response under Exemption 7(C) when no cognizable public interest asserted).[6]

The Court will grant summary judgment to the FBI on Counts II and IV.

## 2.

For its *Glomar* response to Callimachi's request about UM 0215, the FBI relies on FOIA Exemptions 1 and 3.  Exemption 1 protects matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."  5 U.S.C. § 552(b)(1).  The FBI invokes Executive Order 13,526, which authorizes the classification of

---

[6]  In passing, Callimachi seemingly challenges the FBI's *Glomar* responses because they reflected the FBI's "internal policies, which are not the law."  Pl.'s Reply at 5.  That argument does not engage with whether Exemptions 6 and 7(C) justify the *Glomar* responses.  And in any event, courts have upheld similar *Glomar* responses where the FBI relied on the same internal policies on which it relied here.  *See Pugh v. FBI*, 793 F. Supp. 2d 226, 233 (D.D.C. 2011).

information that "pertains to," among other things, "intelligence activities (including covert action), intelligence sources or methods, or cryptology" if that information "could reasonably be expected to" damage national security.  Exec. Order No. 13,526 § 1.4(c), 75 Fed. Reg. 707, 708 (Dec. 29, 2009).

Exemption 3 applies to matters "specifically exempted from disclosure by [a] statute" other than FOIA.  5 U.S.C. § 552(b)(3).  To support the Exemption 3 response, the FBI relies on the National Security Act of 1947, which provides that the "Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure."  50 U.S.C. § 3024(i)(1); *see Miller v. Casey*, 730 F.2d 773, 777 (D.C. Cir. 1984) (holding that provision in predecessor version of the Act supports Exemption 3).

Here, the FBI has logically and plausibly explained why the existence or nonexistence of responsive records is classified information.  The existence of responsive records would show that the FBI "has an intelligence interest in, and the ability to gather information about" a foreign intelligence agency.  *Knight First Amdt. Inst.*, 11 F.4th at 819.  Confirmation or denial of the existence of records would allow foreign adversaries "to learn about the interests, certain methods, and capabilities of the FBI and about its intelligence-gathering activities."  Seidel Decl. ¶ 139.  Adversaries could use that knowledge to employ "countermeasures to nullify" the effectiveness of the FBI's activities.  *Id.* ¶ 136.  The D.C. Circuit has credited this concern when upholding *Glomar* responses.  *See Knight First Amdt. Inst.*, 11 F.4th at 820; *accord Wolf*, 473 F.3d at 372 ("[C]onfirming or denying an Agency interest in a foreign national reasonably could damage sources and methods by revealing [agency] priorities, thereby providing foreign intelligence sources with a starting point for applying countermeasures against the [agency] and thus wasting Agency resources.").

On the other hand, the nonexistence of responsive records would signal the FBI's lack of an intelligence interest in Romanian agencies. *See id.* ¶ 139. That would be "extremely valuable information" to foreign adversaries looking for blind spots in the FBI's capabilities. *Id.* Recall that the FBI can assume that "foreign intelligence agencies are zealous ferrets," *Gardels*, 689 F.2d at 1106, that will review all "officially released information" for U.S. intelligence agencies, Seidel Decl. ¶ 137.

Consistent with D.C. Circuit precedent, the Court accords "substantial weight" to these representations of harm in the national security sphere. *Wolf*, 473 F.3d at 376. Callimachi offers no reason to do otherwise. In fact, Callimachi rests exclusively on her implausibility argument. She never argues that the FBI improperly relied on Exemptions 1 and 3.

Based on the FBI's declaration, the Court will grant summary judgment to the FBI on Count V.

## IV.

Next, consider the FBI's response to the Botez Request. Callimachi challenges the adequacy of the Bureau's search for records and whether the agency properly invoked various FOIA exemptions.

## A.

First, the search for responsive records. To locate records, the FBI conducted an index search of its Central Records System (CRS). *See* Seidel Decl. ¶ 42. That system "is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files" from across "the entire FBI organization." *Id.* ¶ 27. The agency organizes files in the CRS by a series of indices. FBI investigators add an index to a file "when information is deemed of sufficient significance to warrant indexing for future retrieval." Seidel

Decl. ¶ 30.  FBI personnel may index information by "individual," "organization," or "event."

*Id.*

The indices fall into two categories: main entries and reference entries.  *See id.* ¶ 29.

Main index entries correspond to the primary subject of an investigation, and reference index

entries correspond to topics that, while not the main subject of an investigation, are "associated

with" the investigation.  *Id.*  The FBI also maintains manual indices, which investigators

originally entered on physical index cards.  *See id.* ¶ 37.  Now, the FBI can search those manual

indices electronically.  *See id.* ¶ 39.  In response to Callimachi's request, the FBI searched the

main index entries, the reference index entries, and the manual indices using the terms "Mihail

Botez" and "Mihai Botez."  *See id.* ¶¶ 40, 42.  That search yielded 171 pages of responsive

documents.  *See id.* ¶ 42.

An agency responding to a FOIA request "must conduct a search reasonably calculated to

uncover all relevant documents and, if challenged, must demonstrate beyond material doubt that

the search was reasonable."  *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990) (cleaned

up).  The adequacy of a search does not turn on "whether there might be" more uncovered

documents.  *Kowalczyk v. DOJ*, 73 F.3d 386, 388 (D.C. Cir. 1996).  A search instead is adequate

if the agency shows that the search method "was reasonably calculated to uncover all relevant

documents."  *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).  The agency can carry

its burden through affidavits "setting forth the search terms and the type of search performed[ ]

and averring that all files likely to contain responsive materials . . . were searched."  *Id.*

The FBI has carried its burden here.  According to its affidavit, the CRS is "where the

FBI indexes information about *individuals*, organizations, events, and other subjects."  Seidel

Decl. ¶ 43 (emphasis added).  The FBI searched all indices, including the manual ones.  *See*

Seidel Decl. ¶¶ 40–42.  Because Botez was an individual, a search of those indices would be "reasonably calculated" to locate all FBI records pertaining to him.  *Oglesby*, 920 F.2d at 68, *see* Seidel 2nd Decl. ¶ 6, ECF No. 23-1.  And Callimachi does not suggest that other FBI systems contained responsive records.  Thus, the Court holds that the FBI's search for responsive records was adequate.  *Accord Cunningham v. DOJ*, 40 F. Supp. 3d 71, 85 (D.D.C. 2014) (upholding FBI's index search of CRS for records about an individual).

Callimachi argues that the FBI should have conducted a full-text search.  *See* Pl.'s Reply at 6 & n.1.  She asserts that the FBI has not shown that such a search would be unduly burdensome.  *See id.*  This bare assertion does not help Callimachi.  To overcome the FBI's showing of adequacy, she must "provide evidence that other databases [or searches] are reasonably likely to contain responsive records."  *Prop. of the People v. DOJ*, 530 F. Supp. 3d 57, 61 (D.D.C. 2021).  Nowhere does Callimachi show that a full-text search is reasonably likely to unearth more records.  The Court fails to see how it could.[7]  Callimachi's request seeks records about an individual, a category by which "FBI employees may index information in the CRS."  Seidel Decl. ¶ 30.  Given the breadth of the CRS and that "names of individuals are reasonably likely to be indexed," a search of those indexes was reasonably likely to find records about Botez.  Seidel 2nd Decl. ¶ 6.

---

[7]  True, some judges in this district have ordered the FBI to conduct full-text searches.  But those cases are inapt here.  In *Property of the People, Inc. v. DOJ*, the court ordered a full-text search because the terms at issue did not correspond to the three categories "by which FBI investigators may index information in the CRS."  530 F. Supp. 3d at 62 (cleaned up).  In contrast, Callimachi's request falls within one of those index categories.  *See* Seidel 2nd Decl. ¶ 6.  The agency thus did not repeat its mistake in *Shapiro v. DOJ*, 34 F. Supp. 3d 89, 98–99 (D.D.C. 2014), when it disavowed a full-text search by saying only that "no such search was warranted."  Nor does Callimachi suggest in her Complaint or in her briefing that the FBI should "search targeted files rather than all of [the] CRS."  *Colgan v. DOJ*, No. 14-cv-740 (TSC), 2020 WL 2043828 at *9 (D.D.C. Apr. 28, 2020).

**B.**

Next, the FBI's asserted exemptions.  The FBI invoked multiple FOIA exemptions in its response to the Botez Request.  Recall that "[a]gencies may carry their burden of proof through declarations explaining why a FOIA exemption applies."  *Knight First Amdt. Inst.*, 11 F.4th at 818.  In general, Callimachi argues that the FBI's declarations are insufficient.  She repeatedly urges the Court to conduct *in camera* review of the unredacted documents.  *See* Pl.'s Mot. at 12–19; Pl.'s Reply at 7–9.  FOIA allows courts that option, *see* 5 U.S.C. § 552(a)(4)(B), but "by no means compels" it, *Juarez v. DOJ*, 518 F.3d 54, 60 (D.C. Cir. 2008).  Here, the Court exercised its "broad discretion," *Loving v. DOD*, 550 F.3d 32, 41 (D.C. Cir. 2008), and reviewed the withheld documents *in camera*, *see* Min. Order, Jan. 6, 2022.

The Court is also mindful of FOIA's new foreseeable harm requirement.  An agency may not withhold exempt materials unless the agency "reasonably foresees that disclosure would harm an interest protected by" a FOIA exemption.  5 U.S.C. § 552(a)(8)(A)(i)(I).  The Circuit requires agencies to articulate the harm from disclosure in a "focused and concrete way."  *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021); *see Reps. Comm. for Freedom of the Press v. CBP*, — F. Supp. 3d —, No. 18-cv-155 (TNM), 2021 WL 4843970 at *3–*4 (D.D.C. Oct. 18, 2021) (surveying caselaw).

But even without a sufficient explanation from the agency, the "context and purpose" of withheld information can support a finding of foreseeable harm.  *Reps. Comm. v. FBI*, 3 F.4th at 369.  And as explained more fully in *Reporters Committee v. CBP*, agencies may more easily meet their foreseeable harm burden when invoking exemptions "for which the risk of harm through disclosure is more self-evident."  2021 WL 4843970, at *12.

With these principles in mind and based on its own *in camera* review, the Court examines the FBI's invocation of various FOIA exemptions.

**1.**

The FBI relies first on Exemption 1. Recall that this exemption protects information authorized by Executive Order to be classified. *See* 5 U.S.C. § 552(b)(1). As with its *Glomar* response, the FBI relies on Executive Order 13,526, which allows classifying information that "could reasonably be expected" to damage national security and pertains to seven types of information. 75 Fed. Reg. at 708. According to the FBI, § 1.4(c) of the Executive Order protects the withheld information. That section covers information "pertain[ing] to . . . intelligence activities (including covert action), intelligence sources or methods, or cryptology." *Id.*

The FBI withheld three types of information under Exemption 1. *First*, "detailed intelligence gathered or compiled" on a "specific individual or organization of national security interest." Seidel Decl. ¶ 58. The FBI asserts that releasing this information would reveal "actual" methods used against a particular target; disclose the FBI's "intelligence-gathering capabilities"; and provide an assessment of "intelligence source penetration of a specific target during a specific period of time." *Id.*

*Second*, the FBI withheld file numbers assigned to specific intelligence activities. *See id.* ¶ 59. Disclosing those numbers would allow adversaries to match information containing the same file number with a particular file. *See id.* ¶ 60. The FBI worries that bad actors could thus craft "a partial mosaic" of intelligence activity associated with a specific file number and identify what intelligence activities correspond with each file number. *Id.*

*Third*, the FBI withheld "identifying information of and information provided by" human intelligence sources. *Id.* ¶ 64. That information included information from those sources that

"could identify" them, possibly subjecting "them to retaliation" for cooperating. *Id.* ¶ 66. The FBI also withheld numerical indicators that it assigned to each source. *See id.* ¶ 67. Disclosure of those identifiers could allow a hostile actor to "correlate the records and whatever information that can be gleaned from [those] records to specific sources." *Id.* The same hostile actor could then match the identifiers with "bits and pieces of other information" to learn the sources' true identities. *Id.* Allowing that to happen could subject the source to retaliation and could chill the FBI's "ability to recruit future sources." *Id.*

Callimachi largely does not question these concerns or the FBI's articulation of them. Instead, she points to § 3.3 of Executive Order 13,526. *See* 75 Fed Reg at 714. Section 3.3(a) automatically declassifies records "that are [ ] more than 25 years old," which describes much of the records here. *Id.* But § 3.3(b)(1) allows records to remain classified if their disclosure would "clearly and demonstrably be expected to[ ] reveal the identity of a confidential human source, a human intelligence source, a relationship with an intelligence or security service of a foreign government or international organization, or a nonhuman intelligence source; or impair the effectiveness of an intelligence method currently in use, available for use, or under development." *Id.* at 714–15.

The FBI affidavit hardly engages with § 3.3(b). Instead, the FBI asserts only that release of the information, "despite the passage of time, would risk revealing the information enumerated in" § 3.3(b)(1). Seidel Decl. ¶ 70. Callimachi dismisses that "conclusory statement" as "vague" and asserts that the FBI has not explained how the withheld information demonstrably harms national security.[8] *See* Pl.'s Mot. at 13–14.

---

[8] Callimachi also contends that the FBI does not say which categories of § 3.3(b)(1) apply to the withheld information. *See* Pl.'s Mot. at 13. This argument misses the text of the Bureau's affidavit. The FBI withheld information that bad actors could use to "discern the true *identities*"

The Court agrees that the FBI's explanation about § 3.3(b)(1) says little.  But taken as a whole, the affidavit makes the required showing under that section.  The withheld material would reveal information about "current" intelligence activities and methods, Seidel Decl. ¶ 56, and about activities "which *continue* to be sources of intelligence to this day," *id.* ¶ 60 (emphasis added).  The FBI's classified declaration makes even more apparent these risks from disclosing the specific information withheld here.  *See In Camera, Ex Parte* Declaration of Michael G. Seidel.  More, the FBI explains how disclosure of information on human intelligence sources could lead to harassment of past (and presumably current) sources, *see* Seidel Decl. ¶¶ 66, 67, which would "dissuade current and future" sources from cooperating with the FBI, *id.* ¶ 66, and chill "the FBI's ability to recruit future sources," *id.* ¶ 67.

The Court finds those statements explain in adequate detail "that the withheld [E]xemption 1 information would expose sources and reveal intelligence methods."  *Hall v. CIA*, 881 F. Supp. 2d 38, 65 (D.D.C. 2012).  Not only does the Court owe these explanations "substantial weight," *Larson v. Dep't of State*, 565 F.3d 857, 867 (D.C. Cir. 2009), but the FBI has described how disclosure of the material would damage the *current* ability of the FBI to recruit human sources.  More, the Court's independent *in camera* review confirms the harm this material could create if disclosed.  For substantially the same reasons, the Court finds that the national security "context and purpose" of the withheld information supports a finding of

---

of intelligence sources.  Seidel Decl. ¶ 67.  The FBI also withheld information that would "reveal the actual intelligence activity or *method* utilized" against a particular person.  *Id.* ¶ 58.  So the affidavit describes information that might be expected to reveal "the identity . . . of a human intelligence source" and to "impair the effectiveness of" current intelligence methods.  Exec. Order 13,526 § 3.3(b)(1).  Those are the types of information withheld here that the FBI says § 3.3(b) protects from disclosure.

foreseeable harm from disclosure. *Reps. Comm. v. FBI*, 3 F.4th at 369. The Court thus will uphold the FBI's withholdings under FOIA Exemption 1.

**2.**

Callimachi next challenges some of the FBI's withholdings under Exemption 7(D). That exemption protects "records or information compiled for law enforcement purposes, but only to the extent that the production of" those records "could reasonably be expected to disclose the identity of a confidential source" or, for records compiled during a criminal investigation, "information furnished by a confidential source." 5 U.S.C. § 552(b)(7)(D). The FBI withheld four categories of information under this exemption. Callimachi challenges only the withholding of "names and identifying information of, and information provided by, individuals to the FBI under an express assurance of confidentiality." Seidel Decl. ¶ 96.

The FBI cannot claim that "all sources providing information in the course of a criminal investigation do so on a confidential basis." *Roth*, 642 F.3d at 1184. Instead, the FBI must "point to more narrowly defined characteristics that . . . support the inference" of confidentiality. *DOJ v. Landano*, 580 U.S. 165, 179 (1993). And when the FBI asserts that a source received an express assurance of confidentiality, it must present "sufficient evidence that such an assurance was in fact given." *Roth*, 642 F.3d at 1184.

Here, the FBI says three "positive indicators" in the withheld information ensure that the agency promised confidentiality to the sources who provided that information. Seidel Decl. ¶ 98. *First*, FBI personnel designated some sources with "CHS," meaning confidential human source, or "CW," meaning cooperating witness. *Id.* According to the agency, "standard FBI practice" requires the agency to promise confidentiality before it can give either designation to a source. *Id. Second*, the FBI found source file numbers associated with a particular individual. *See id.*

These file numbers "are unique to particular confidential sources," *id.* ¶ 94, so their presence is evidence that the associated individual was an official source who received an express assurance of confidentiality, *see id.* ¶ 98. *Third*, the FBI withheld an individual's information when the agency located a source symbol number. *See id.* The FBI assigns these symbol numbers to human sources "who report information to the FBI on a regular basis under an express assurance of confidentiality." *Id.* ¶ 91. Naturally, the presence of a symbol number "is a positive indication" that the individual associated with that number received an express assurance of confidentiality. *Id.* ¶ 98.

Callimachi dismisses these explanations as "categorical and generic," but offers no other reason for the Court to disregard them. Pl.'s Mot. 16. In fact, the D.C. Circuit has upheld similar explanations by the FBI on source symbol numbers. *See Roth*, 642 F.3d at 1185 ("[W]e conclude that the FBI has borne its burden of proving that it provided an express assurance of confidentiality to the source-symbol-number informants mentioned in the *in camera* documents."). And judges in this district have upheld similar statements by the FBI on source file numbers and their assurance of confidentiality. *See, e.g.*, *Pinson v. DOJ*, 177 F. Supp. 3d 56, 89 (D.D.C. 2016); *Webster v. DOJ*, No. 02-cv-603 (RC), 2020 WL 1536303 at *8 (D.D.C. Mar. 31, 2020). Callimachi does not explain why this Court should not do likewise. Nor does she controvert the FBI's evidence in any way.

Callimachi does argue that the FBI has failed to specify whether any of the withheld information came from institutional sources, not individuals. *See* Pl.'s Mot. 16 (citing *Roth*, 642 F.3d at 1186). The Court reviewed all documents *in camera* and confirms that none of the withheld information came from institutional sources. *See* Seidel 2nd Decl. ¶ 9 ("However, the

FBI did not withhold any information pursuant to FOIA Exemption 7(D) consisting of or related to institutional sources.").

Lastly, Callimachi argues that the FBI "has not carried its burden" on foreseeable harm from disclosure of these materials.  Pl.'s Reply at 9.  The Court disagrees.  As the FBI says, "[r]elease of such information would endanger" confidential sources and would "cause great detriment to the FBI's ability to recruit and maintain" reliable sources.  Seidel Decl. ¶ 99. Revealing a source's identity or provided information would weaken the FBI's ability to credibly promise confidentiality to future sources.  *See id.* ¶ 95.  The FBI needs that ability to "recruit and maintain the cooperation" of confidential sources.  *Id.*  Those sources would balk if they knew that the FBI might disclose their information, even years later.  Indeed, the Court finds this risk of harm from disclosure to be "self-evident," *Reps. Comm. v. CBP*, 2021 WL 4843970, at *12, based on the "context and purpose" of information provided by confidential sources, *Reps. Comm. v. FBI*, 3 F.4th at 369.

The Court will uphold the FBI's invocation of Exemption 7(D).

### 3.

The FBI also withheld material under Exemption 7(E).  That exemption protects law enforcement information when releasing it "would disclose techniques and procedures for law enforcement investigations or prosecutions . . . if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  Exemption 7(E) "sets a relatively low bar"; the agency need only "demonstrate logically how the release of the requested information might create a risk of circumvention of the law."  *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011).  Said differently, the agency can withhold any information which "could

increase the risks that a law will be violated." *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009).

Callimachi challenges six categories of information withheld under Exemption 7(E).  In general, she contends that the FBI's justification of the 7(E) withholdings is "formulaic."  Pl.'s Mot. at 17.  She also argues that the FBI does not sufficiently explain "why redaction of techniques and procedures employed in the 1990[s] and earlier could still be" reasonably expected to risk circumvention of the law.  *Id.* at 18.  And she contends that the FBI has not carried its burden on foreseeable harm for these materials.  *See* Pl.'s Reply at 9–10.

Yet foreseeable harm for Exemption 7(E) is linked to a proper assertion of the exemption itself.  Because the exemption "by its own terms" requires an agency to show a risk of circumvention from disclosure, fulfilling the terms of 7(E) also fulfills the foreseeable harm requirement.  *Reps. Comm. v. CBP*, 2021 WL 4843970, at *19; *see CREW v. DHS*, 525 F. Supp. 3d 181, 192 & n.4 (D.D.C. 2021).  So if the FBI has properly invoked Exemption 7(E), it has also carried its burden under the foreseeable harm requirement. It carries that burden here.

Callimachi again asks the Court to review these documents *in camera.*  The Court has done so.  That review informs the Court's holding that the FBI properly withheld the materials.

### a.

In the first category, the FBI withheld "sensitive investigative file numbers located in the records at issue."  Seidel Decl. ¶ 102.  These non-public numbers consist of a file classification number, an office of origin code, and a string of numbers assigned to the particular subject matter.  *See id.* ¶ 102–04.  According to the FBI, criminals could use this information to discern the types of investigative strategies pursued by the FBI when these non-public numbers are present.  *See id.* ¶ 102.  The file numbers also would reveal which FBI field office has

responsibility over certain types of investigations.  *See id.* ¶ 103.  And criminals could use the number string as a "tracking mechanism by which" a bad actor "can place particular files and thus[ ] investigations within the context of larger FBI investigative efforts."  *Id.* ¶ 104.

The Court agrees that disclosing this information would give bad actors "an exceptional understanding" of the FBI's procedures.  *Id.* ¶ 105.  A criminal could use various components of these numbers to track how the FBI investigates particular subjects and whether those investigations might relate to one another.  *Id.* ¶ 104.  And a criminal who knows which office originated which file might then adjust his behavior to avoid that office's purview, geographic or otherwise.  Finally, these concerns do not evaporate because the records are older.  With knowledge of "when, why, and how the FBI pursues or pursued different investigations," criminals could adjust their behavior or employ countermeasures to escape detection.  *Id.*  The FBI's file numbers, though small, provide that knowledge and show how the FBI keeps tabs on various subjects.  Because the FBI has explained how criminals could use this risk to avoid detection, the FBI has shown a risk of circumvention from disclosure.

**b.**

The FBI next withheld "methods used to collect and analyze information obtained for investigative purposes."  *Id.* ¶ 106.  The FBI says that release of this information would disclose how and from where the FBI collected information and how the agency analyzed that information.  *See id.*  Disclosure would allow subjects of FBI investigations to "accumulate information" on specific methods and the usefulness of any obtained information.  *Id.*

Specific to this category, Callimachi argues that the FBI's explanation—which "amounts to a single paragraph"—is too generic.  Pl.'s Mot. at 18.  After *in camera* review, the Court is persuaded that disclosure of this category would risk circumvention of the law.  A criminal can

double his efforts to avoid detection once he knows the methods that law enforcement uses to catch wrongdoers.  That is true even for historical methods.  Not only do the law enforcement procedures of today build on what came before, but certain investigations might require a return to earlier investigative techniques.  After all, Sherlock Holmes began using fingerprint evidence 130 years ago, and that technique remains critical to law enforcement today.  *See* Arthur Conan Doyle, *Sign of Four* 55 (Penguin Classics 2001) (1890).  Disclosing those older techniques thus gives criminals a fair bit of insight into how the FBI conducts investigations.  With that knowledge, a criminal could adjust his behavior to avoid detection.  *See* Seidel Decl. ¶ 106 ("Release of this type of information would enable criminals to educate themselves about the methods employed . . . and therefore allow them to take countermeasures to circumvent these methods and to continue to engage in violations of federal law.").

As the FBI notes, human sources comprise one method used by the Bureau.  *See* Seidel 2nd Decl. ¶ 11.  Disclosing information about those methods thus could endanger those sources (including those who are still alive but no longer working with the FBI) and allow bad actors to know how the FBI collects and manages human sources.[9]  *See id.*  Bad actors could exploit any weaknesses in those procedures.  *Accord Sack v. DOJ*, 823 F.3d 687, 694–95 (D.C. Cir. 2016) (upholding nondisclosure when reports identified deficiencies in polygraph procedures that "could enable criminal suspects, employees with ill intentions, and others to subvert polygraph examinations").

---

[9]  Callimachi responds that this explanation in the Second Seidel Declaration contradicts what was in the first declaration, thus undermining the Bureau's 7(E) withholdings.  *See* Pl.'s Reply at 10.  She is correct that the FBI did not make this point originally.  But after *in camera* review, the Court accepts that release of this information would indeed threaten human sources and allow criminals to counteract the FBI's procedures for those types of sources.

The Court therefore agrees that the FBI has shown that disclosure of this information would risk circumvention of the law.

**c.**

Third, the FBI withheld "the location and identity of an FBI unit, squad, and division involved in the investigation of Mihail Botez." Seidel Decl. ¶ 107. This information often appears in the headings of internal agency documents. *See id.* The FBI says that disclosing the location of these squads could reveal the investigative subject and the physical areas of interest to that investigation. *See id.* A bad actor might avoid a particular location if it appears often in the disclosed records or might "avoid altogether certain activities in certain locations." *See id.* As for the identity of these units, a criminal who knows which unit investigates which crimes could conceal his behavior to ensure the named unit does not discover it. And many FBI units "are highly specialized." *Id.* Revealing their involvement in a particular type of investigation would tip bad actors to when and how and where the FBI deploys such units. That information only helps criminals adjust their behavior to avoid those units.

Callimachi questions "why revealing the office that investigated Botez's death in 1995 cannot be released." Pl.'s Mot. at 19. She mistakes the timing. The FBI withheld information in this category for 2010 documents. *See Vaughn Index* at 294. And the Court's *in camera* review confirms that the withheld information corresponds with *current* FBI offices, not offices that investigated Botez's death. *See* Seidel 2nd Decl. ¶ 12 ("[T]hese documents contain headings that reveal locations where the documents originated and where they were received; locations that are still utilized by the FBI."). Thus, disclosure of this information would say something about how the FBI currently conducts investigations. That is consequential information for any criminal seeking to circumvent the law.

The Court will uphold the FBI's nondisclosure of information in this category.

**d.**

Callimachi next challenges "the identity of sensitive, non-public investigative databases" and search results located through those databases.  Seidel Decl. ¶ 110.  The FBI asserts that disclosing this information would reveal which databases are most useful to the agency and what information the FBI finds most helpful when it conducts investigations.  *See id.* ¶¶ 111–12.  This information would also reveal where the FBI stores valuable information and how it obtains that data.  *See id.* ¶ 113.

The Court agrees with the FBI's assessment.  A criminal who knows what information the FBI relies on could adjust his behavior to avoid detection.  *See Shapiro*, 893 F.3d at 800 ("We allow the FBI to withhold records under Exemption 7(E) on the basis that releasing them would provide information on how a database is searched, organized, and reported." (cleaned up)).  And the Court's *in camera* review confirms that the search results here include more information than what might appear on a credit score or other common background checks.  Criminals should not know the scope of that information.  *See* Seidel 2nd Decl. ¶ 14 (noting that disclosure of this information would give criminals and understanding of how to structure behavior or deploy countermeasures "to deprive the FBI of useful intelligence.").  More, disclosure of the databases' identities tells criminals which database the Bureau relies on.  Cyber criminals seeking to cripple the FBI's capabilities might then know to target those databases.  *See id.* ¶ 15 ("Knowing the database names renders the original sources of the data vulnerable to compromise.").

As for Callimachi's argument that the FBI has not confirmed whether it uses these databases today, the Bureau says that disclosure would "give criminals insight into the available

tools and resources the FBI used *and continues to use*." Seidel Decl. ¶ 110 (emphasis added). The Court affords that statement a presumption of good faith. *See SafeCard Servs., Inc.*, 926 F.2d at 1200. And even if the databases have slightly changed since the mid-1990s, a cyber criminal with access to FBI systems could use the names of those older databases to find and target those successors. That possibility, discussed in the Second Seidel Declaration, is enough to show a current risk of circumvention from disclosure of this information. *See* Seidel 2nd Decl. ¶ 15.

### e.

The FBI also withheld "the non-public focuses of specific FBI counterintelligence investigations in the records at issue." Seidel Decl. ¶ 115. The risk of circumvention that would attend disclosure of this information appears obvious. Disclosure would alert subjects to the FBI's interest, allowing them "to conceal or destroy evidence or to modify their behavior to avoid future investigative scrutiny." *Id.* These records are not so old that any subject mentioned in them must be dead. And disclosing the focus of investigations would also reveal the FBI's conclusions and how the FBI plans to pursue those investigations. *See id.* Armed with such information, subjects could predict the FBI's next steps in similar investigations, allowing the preemptive deployment of countermeasures to undermine the FBI's effectiveness. *See id.*

More, disclosure would reveal "when and why" the FBI pursues some investigation focuses or shifts its focus. *Id.* ¶ 116. This would allow criminals to know what "types of evidence or intelligence the FBI possessed at particular points in time, and possibly when and how such information was obtained." *Id.* The same criminals could use that non-public detail to their advantage, modifying their own operational security to avoid giving the FBI sufficient evidence to refocus on them. *See id.* Finally, disclosure would reveal the scope of the FBI's

gathered intelligence, permitting criminals to identify gaps in the FBI's process and exploit those gaps to circumvent the agency.  *See* Seidel 2nd Decl. ¶ 17.

The Court therefore holds that the FBI properly invoked Exemption 7(E) for this information.

### f.

Lastly, the FBI withheld "information pertaining to the types and dates of investigations referenced in the records at issue."  Seidel Decl. ¶ 118.  "The investigation of certain matters is often highly sensitive[ ]" and for those matters the FBI uses particular investigative techniques. *Id.* ¶ 119.  The Court agrees with the Bureau that revealing this information would show its investigative "toolbox" that it uses for some investigations.  *Id.*  Criminals could use disclosure here to adjust their behavior to avoid certain tools in that toolbox.  Disclosure would "show the type of criminal behavior or intelligence that predicated the initiation of a particular type of investigation."  *Id.*  Criminals could thus "educate themselves" on how their behavior can avoid a type of investigation.  *Id.*

The same holds for information about the timing of investigations.  Some of the information withheld shows whether the FBI's investigation was a "preliminary" one or a "full" one.  *Id.* ¶ 118.  This distinction apparently matters because a designated "full" investigation makes available certain techniques and procedures not otherwise available for preliminary investigations.  *See id.*  Criminals could do much with that information.  Knowledge of when and under what circumstances the FBI initiates a full investigation would allow criminals to modify their behavior so they can avoid being the subject of a full investigation.  The same is true for information about when the FBI begins a preliminary investigation.  If a criminal knows these investigative habits, he can assess and exploit them.  That the information concerns past

investigations changes nothing—"a potential criminal can glean the same information about investigative techniques from past investigations as present ones." *Reps. Comm. v. CBP*, 2021 WL 4843970, at *22.

Thus, disclosure of this information would allow criminals to predict the FBI's next steps and to adjust behavior to avoid those steps. The Court therefore holds that the Bureau properly invoked Exemption 7(E) for this category.

### 4.

The FBI also withheld information under Exemption 3, which protects any information "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3). As with its *Glomar* response, the FBI relied on 50 U.S.C. § 3024(i)(1), which requires the Director of National Intelligence to protect "intelligence sources and methods" from disclosure. Callimachi says the FBI failed to "describe what was withheld and why" under this Exemption. Pl.'s Mot. at 15.

The Court's *in camera* review confirms that the FBI asserted Exemption 3 only along with Exemptions 1 and 7(E).[10] Recall that the Court has upheld the use of those exemptions. So the Court need not render an opinion on whether the FBI properly invoked Exemption 3. *See Larson*, 565 F.3d at 862–63 ("[C]ourts may uphold agency action under one exemption without considering the applicability of the other.").

### C.

Finally, the FBI must "demonstrate that all reasonably segregable material has been released." *Johnson v. EOUSA*, 310 F.3d 771, 776 (D.C. Cir. 2002). To meet this burden, the agency can rely on the combination of its declarations and *Vaughn* Index. *See id.* The agency is

---

[10]  In contrast, the State Department applied only Exemption 3 to information on pages 107 and 108. Callimachi does not challenge those withholdings. *See* Pl.'s Mot. at 14, n.4.

also "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007). To overcome that presumption, Callimachi must provide a "quantum of evidence." *Id.*

Here, the FBI reviewed all responsive pages "line by line" to determine what segregable information it could release.  Seidel Decl. ¶ 124.  For the redacted pages, the FBI released a mix of segregable information and information covered by a FOIA Exemption.  *See id.*  For the pages withheld in full, the FBI determined that *all* information on 53 of those pages was exempt from disclosure and thus not segregable.  *See id.*  Other withheld pages were duplicates of pages in the rest of the production.

Callimachi does not challenge the FBI's determination on segregability.  And the combination of the Bureau's *Vaughn* Index and affidavits show with "reasonable specificity"— confirmed by the Court's *in camera* review—that the Bureau released all segregable information. *Johnson*, 310 F.3d at 776.   The Court holds that the FBI fulfilled its segregability obligation.

**V.**

For these reasons, the Court will grant the Bureau's Motion for Summary Judgment and will deny Callimachi's Cross-Motion for Summary Judgment.  A separate Order will issue.


Dated:  January 28, 2022                                         TREVOR N. McFADDEN, U.S.D.J.